**IN THE UNITED STATES**
**COURT OF INTERNATIONAL TRADE**

SHENZHEN BITLAND INFORMATION
TECHNOLOGY CO., LTD,


*Plaintiff*,

v.

UNITED STATES OF AMERICA;
DEPARTMENT OF HOMELAND
SECURITY; UNITED STATES CUSTOMS
AND BORDER PROTECTION; FORCED
LABOR ENFORCEMENT TASK FORCE;
MARKWAYNE MULLIN, *in his official*
*capacity as the Secretary of the Department*
*of Homeland Security*; RODNEY S. SCOTT,
*in his official capacity as Commissioner for*
*U. S. Customs and Border Protection*; and
ROBERT LAW, *in his official capacity as the*
*Under Secretary for Office of Strategy,*
*Policy, and Plans and Chair of the Forced*
*Labor Enforcement Task Force*,


*Defendants*.

**COMPLAINT**

Case No.: 26-03083

Shenzhen Bitland Information Technology Co., Ltd., (hereafter, "Plaintiff" or "Shenzhen Bitland") alleges as follows against Defendants United States of America, U.S. Department of Homeland Security ("DHS"), U.S. Customs and Border Protection ("CBP"), Forced Labor Enforcement Task Force ("FLETF"), Markwayne Mullin, in his official capacity as the Secretary of the Department of Homeland Security, Rodney S. Scott, in his official capacity as Commissioner for CBP, and Robert Law, in his official capacity as the DHS Under Secretary for Office of Strategy, Policy, and Plans and Chair of FLETF (collectively, "Defendants").

**INTRODUCTION**

1.     Plaintiff Shenzhen Bitland Information Technology Co., Ltd. ("Shenzhen Bitland") brings this action to challenge Defendants' continued failure to remove its former subsidiary, Hefei Bitland Information Technology Co., Ltd. ("Hefei Bitland") from the Uyghur Forced Labor Prevention Act ("UFLPA") Entity List. From the outset, Defendants' listing was indefensible. At all relevant times, including on the UFLPA's effective date, Hefei Bitland was a shuttered, non-operational, and essentially defunct entity incapable of engaging in any conduct covered by the UFLPA—a fact that was both knowable and readily verifiable. Yet Defendants persisted for years, leaving a dissolved company on a list reserved for entities engaged in ongoing forced-labor-related activity, and in doing so inflicted continuing, concrete, and irreparable harm on Shenzhen Bitland—formerly its parent company—which is indisputably not engaging in forced-labor-related activity.

2.     The UFLPA was signed into law in December 2021 and went into effect on June 21, 2022. Under the UFLPA, FLETF is charged with compiling and maintaining lists of entities that it has a reasonable basis to believe are either manufacturing goods using forced labor by Uyghurs and other minority groups in the Xinjiang Uyghur Autonomous Region ("XUAR") of China, or are currently "working with the government of the Xinjiang Uyghur Autonomous

Region" to "recruit, transport, transfer, harbor or receive" such labor out of the XUAR. UFLPA § 2(d)(2)(B).

3. The UFLPA identifies five sub-lists, each with distinct criteria, collectively referred to as the "UFLPA Entity List." UFLPA § 2(d)(2)(B)(i)–(v). The Act further directs CBP to apply a rebuttable presumption that any goods produced by an entity on that List violate 19 U.S.C. § 1307's prohibition on goods made with forced labor and must be detained and excluded from the United States ("CBP Rebuttable Presumption"). UFLPA § 3(a).

4. The first UFLPA Entity List was released on June 21, 2022. For each of the entities added, the listing notice failed to provide any specific facts that supported why the entities were being included. Instead, the notice revealed that the Defendants took a shortcut. Defendants simply listed entities that had been (i) subject to prior CBP actions (*e.g.*, Withhold Release Orders ("WROs")) and/or (ii) included on the Department of Commerce Bureau of Industry and Security ("BIS") Entity List. 87 Fed. Reg. 47,778. Apparently, an entity subject to either action would be added to the UFLPA Entity List without any independent investigation into the merits of the CBP or BIS determination or sufficient assessment of whether the CBP or BIS determination formed a sufficient factual basis for listing under the UFLPA's criteria.

5. Because Hefei Bitland had been placed on the BIS Entity List in July 2020 and, as a result of that listing, was subject to a WRO as of September 2020, it was swept onto this first UFLPA Entity List. It was placed on sub-lists for entities "working with" XUAR authorities, § 2(d)(2)(B)(ii), and those that "source material" from the XUAR, § 2(d)(2)(B)(v). However, the listing said nothing about how Hefei Bitland worked with XUAR authorities or sourced material from the XUAR. Hefei Bitland was simply left to surmise that its placement on the BIS Entity List years earlier was the basis for its listing.

6. FLETF's blind reliance on BIS's listing of Hefei Bitland was wholly unreasonable, as any investigation into Hefei Bitland would have revealed. As Hefei Bitland came to learn in connection with challenging the BIS listing, the BIS listing—and follow-on WRO—was based on a single, unverified allegation reproduced in an appendix to a third-party report and was not the product of any investigation into Hefei Bitland. Further, Defendants offered no explanation for how a 2020 BIS action could justify a separate UFLPA listing two years later, when, by June 2022, Hefei Bitland had been essentially defunct for nearly two years—not conducting business, with its workforce laid off. A shuttered company cannot be "working with" XUAR authorities to recruit or transfer labor, nor can it be "sourcing material" under any government labor program.

7. Recognizing Hefei Bitland's inactive status, BIS removed Hefei Bitland from the BIS Entity List in 2024 after reviewing an overwhelming evidentiary record confirming that Hefei Bitland was dissolved and non-operational, while also acknowledging Shenzhen Bitland's strengthened compliance program. *See Addition of Entities, Revision of an Entry, and Removal of Entries on the Entity List*, 89 Fed. Reg. 84,460 at 84,461 (Oct. 23, 2024); Press Release, BIS, *Commerce Adds 26 Entities to the Entity List for Actions Contrary to U.S. National Security Interests* (Oct. 21, 2024), https://www.bis.gov/press-release/commerce-adds-26-entities-entity-list-actions-contrary-u.s.-national-security-interests.

8. Immediately thereafter and consistent with the procedures set forth in the Listing Decision, Plaintiff filed a "Request for Removal" with FLETF, explaining that the evident predicate for Hefei Bitland's UFLPA listing—its prior inclusion on the BIS Entity List—had been rescinded. In support, Plaintiff enclosed the BIS removal decision and hundreds of pages of verifiable documentation demonstrating that Hefei Bitland was non-operational and defunct and that Shenzhen Bitland itself has adopted stringent labor policies and procedures to prevent any unfair labor practices among all Bitland entities.

9.      Defendants took no meaningful action. For over a year, FLETF has vacillated between silence, statements that it had "no questions," and belatedly issuing questions that largely repeated material already provided or strayed from the dispositive issue, that is, how a defunct company could meet any UFLPA criterion. FLETF also conducted a one-way "listening session" without substantive engagement and, only after Plaintiff indicated that litigation was imminent, issued a second and third set of multi-part questions expanding far beyond Hefei Bitland to unrelated topics across the broader Bitland group. More than eighteen months after Shenzhen Bitland requested removal, FLETF has not issued a decision, provided a timeline for a decision, explained why Hefei Bitland still meets the statutory criterion for listing, or produced the administrative record, while Shenzhen Bitland continues to suffer ongoing, irreparable harm from the listing. Defendants' course of conduct—including its annual issuance of the UFLPA Entity List with Hefei Bitland on it— has caused Shenzhen Bitland the same harm as if Defendants had formally denied the request: Shenzhen Bitland's major customers refuse to do business with the company due to the continued listing, and the resulting commercial and reputational harm continues to mount.

10.      Defendants' continued failure to remove Hefei Bitland from the UFLPA Entity List violates the Administrative Procedure Act in multiple ways. First, Defendants have unlawfully withheld and unreasonably delayed discrete agency action—acting on Plaintiff's removal request— in violation of 5 U.S.C. § 706(1). Second, Defendants' annual publication of a UFLPA Entity List that includes Hefei Bitland despite the clear negation of the basis for its listing is arbitrary and capricious and fails to comply with Defendants' statutory duties under the UFLPA in violation of 5 U.S.C. § 706(2). Third, Defendants' reliance on alleged pre-UFLPA conduct to justify the repeated listing of Hefei Bitland constitutes an impermissible retroactive application of the statute in violation of 5 U.S.C. § 706(2).

11. Defendants' continued refusal to remove Hefei Bitland has caused—and continues to cause—direct, concrete, and irreparable harm to Shenzhen Bitland, including the continued loss of customers, and substantial reputational injury.

## PARTIES

12. Plaintiff Shenzhen Bitland Information Technology Co., Ltd. is a company organized and existing under the laws of the People's Republic of China, with a principal office located at Floor 4, Block A, Xinshiyi Chuangke Park, Pingshan 1st Road, Taoyuan Street, Nanshan District, Shenzhen, Guangdong, China. Shenzhen Bitland is engaged in the business of manufacturing and selling computer and peripheral equipment.

13. Shenzhen Bitland has suffered direct, concrete, and ongoing injuries as a result of Defendants' refusal and delay in removing Hefei Bitland from the UFLPA Entity List after the basis for the listing had clearly been negated. Because of the CBP Rebuttal Presumption, stigma, and other regulatory concerns that go along with a UFLPA listing, multiple customers, suppliers, and logistics providers refuse to enter into (or resume prior) business relationships with Shenzhen Bitland even after Hefei Bitland was removed from the BIS Entity List. These monetary, contractual, and reputational injuries are independent of any harm to Hefei Bitland and are traceable to Defendants' continued failure to reverse their Listing Decision even though the basis for listing has clearly been negated. Removal of Hefei Bitland from the UFLPA Entity List would redress these harms that continue to damage Shenzhen Bitland's business.

14. The Department of Homeland Security is a federal agency headquartered in the District of Columbia, with its principal office located at 245 Murray Lane S.W., Washington, D.C. 20528. Among its duties, DHS leads FLETF.

15. U.S. Customs and Border Protection is a federal agency headquartered in the District of Columbia, with its principal office located at 1300 Pennsylvania Avenue N.W.,

Washington, D.C. 20229. CBP is a component agency of DHS. Among its responsibilities, CBP enforces federal laws governing the importation of goods into the United States, including enforcement of the UFLPA's rebuttable presumption.

16.     The Forced Labor Enforcement Task Force is an interagency task force composed of representatives from seven federal agencies. Congress established FLETF in the United States–Mexico–Canada Agreement Implementation Act, Pub. L. No. 116-113, 134 Stat. 11 (2020). *See* 19 U.S.C. § 4681(a). On information and belief, FLETF primarily conducts its meetings and business in the District of Columbia. Among its duties, FLETF monitors enforcement of federal prohibitions on the importation of goods made with forced labor.

17.     Secretary Markwayne Mullin is sued solely in his official capacity as Secretary of DHS. In that capacity, he is ultimately responsible for the activities of DHS and CBP, including the actions challenged in this Complaint. Secretary Mullin maintains an office at 245 Murray Lane S.W., Washington, D.C. 20528.

18.     Rodney S. Scott is sued solely in his official capacity as Commissioner of CBP. In that capacity, he is responsible for the activities of CBP, including the actions challenged in this Complaint. Commissioner Scott maintains an office at 1300 Pennsylvania Avenue N.W., Washington, D.C. 20229.

19.     Robert Law is sued solely in his official capacity as DHS Under Secretary for Strategy, Policy, and Plans and as Chair of FLETF. In that capacity, he is responsible for the activities of FLETF, including the actions challenged in this Complaint. Mr. Law maintains an office at 245 Murray Lane S.W., Washington, D.C. 20528.

20.     The United States of America is amenable to service through the Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch, Department of Justice. C.I.T. R. 4(h).

**JURISDICTION AND VENUE**

21.    This action arises under the Administrative Procedure Act, 5 U.S.C. §§ 702-706, and the UFLPA, Pub. L. No. 117-78, 135 Stat. 1525 (2021).

22.    This Court has jurisdiction under 28 U.S.C. § 1581(i) because this action arises out of laws providing for embargoes and other quantitative import restrictions, and the administration and enforcement thereof. *See Ninestar Corp. v. United States*, 666 F. Supp. 3d 1351, 1354 (Ct. Int'l Trade 2023) ("*Ninestar I*").

23.    Venue is proper in this Court because the Court of International Trade is a national court of limited jurisdiction and is empowered to hear UFLPA actions arising under 28 U.S.C. § 1581(i).

**LEGAL BACKGROUND**

24.    For nearly a century, U.S. law has barred the entry of goods made with forced labor. Since the Tariff Act of 1930, Congress has directed that products manufactured in whole or in part by forced labor abroad may not be imported into the United States. 19 U.S.C. § 1307.

25.    Congress later strengthened federal oversight in this area through the United States–Mexico–Canada Agreement Implementation Act, Pub. L. No. 116-113, 134 Stat. 11 (2020). That statute required the creation of the Forced Labor Enforcement Task Force ("FLETF") to coordinate enforcement of the United States forced-labor import ban. *See* 19 U.S.C. § 4681(a). In response, the President formally established FLETF by Executive Order on May 15, 2020. Exec. Order No. 13,923, 85 Fed. Reg. 30,587 (May 15, 2020).

26.    FLETF is chaired by the Secretary of Homeland Security and includes senior officials from six additional agencies: the Departments of State, Treasury, Justice, Labor, and Commerce, as well as the Office of the U.S. Trade Representative. The Secretary of Homeland

8

Security later delegated chair responsibilities to the DHS Under Secretary for Strategy, Policy, and Plans.

27.    Congress enacted the Uyghur Forced Labor Prevention Act ("UFLPA"), Pub. L. No. 117-78, 135 Stat. 1525 (2021), to further reinforce the prohibition codified in § 1307. The UFLPA directs federal agencies to block imports tied to forced labor affecting Uyghurs and other minority groups in the People's Republic of China, particularly in the Xinjiang Uyghur Autonomous Region ("XUAR"). UFLPA §§ 1-2. In doing so, the statute articulates the United States' policy of combating forced labor globally and leading international efforts to eliminate such practices. *Id.* § 1. The Act became effective on June 21, 2022.

28.    To fulfill its statutory mandate, the UFLPA requires FLETF—following notice, public comment, and a hearing—to devise a strategy "to prevent the importation into the United States of goods mined, produced, or manufactured wholly or in part with forced labor in the People's Republic of China." UFLPA § 2(a)-(c) ("UFLPA Strategy").

29.    As part of that UFLPA Strategy, the UFLPA directs FLETF to compile and periodically update several categories of entities associated with forced-labor risks, including:

   a. entities in the XUAR that mine, produce, or manufacture wholly or in part any goods, wares, articles and merchandise with forced labor;

   b. entities working with the government of the XUAR to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the XUAR;

   c. entities that exported products mined, produced, or manufactured wholly or in part by entities in (1) or (2) from the People's Republic of China into the United States; and

d.  facilities and entities, including the Xinjiang Production and Construction Corps, that source material from the XUAR or from persons working with the government of the XUAR or the Xinjiang Production and Construction Corps for purposes of the "poverty alleviation" program or the "pairing-assistance" program or any other government labor scheme that uses forced labor. UFLPA § 2(d)(2)(B)(i)–(v), (e)(2).

30.    FLETF is required to update the appropriate Congressional committees on the above strategy on an annual basis. UFLPA § 2(e). This includes updates to the UFLPA Entity List. UFLPA § 2(e)(2).

31.    Pursuant to its standard operating procedures, FLETF may add an entity to the UFLPA Entity List when it determines that "specific and articulable information" provides reasonable cause to believe the entity meets one of the statutory listing criteria. FLETF *Standard Operating Procedures* § I(C)(2)(a) (July 2022). An entity may be added to the UFLPA Entity List by a majority vote of FLETF member agencies.

32.    As to any entity on the UFLPA Entity List, the Act directs CBP to apply a rebuttable presumption that importation of "any goods, wares, articles, and merchandise . . . produced by an entity on [the] list" is barred under 19 U.S.C. § 1307 and therefore inadmissible at all U.S. ports of entry. UFLPA § 3(a).

33.    CBP must continue to apply this presumption unless the Commissioner determines that the importer of record has: (i) fully complied with FLETF's supply-chain guidance; (ii) cooperated completely with all CBP requests for information; and (iii) demonstrated, by clear and convincing evidence, that the goods were not produced in whole or in part with forced labor. UFLPA § 3(b). These conditions are cumulative, and failure to satisfy any one of them results in exclusion of the merchandise.

34.     CBP has explained that the UFLPA's rebuttable presumption "exponentially increases the scope and volume of goods subject to examination and enforcement at ports of entry . . . under 19 U.S.C. § 1307," reflecting the heightened scrutiny imposed on shipments linked to entities on the UFLPA Entity List. *See* CBP, *UFLPA Fiscal Year 2022 Obligation and Implementation Plan* (Oct. 12, 2022).

35.     FLETF will hear requests for removal from the UFLPA Entity List if an entity can "provide information that demonstrates that the entity no longer meets or does not meet the criteria described in the [Act]" for listing. 87 Fed. Reg. at 47,778 (Aug. 4, 2022). Given that FLETF does not provide the factual basis for the listing, this removal procedure requires the listed entity to essentially guess the factual basis and then prove why it is incorrect, for example, that it is *not* working with the government of Xinjiang "to recruit, transport, transfer, harbor or receive forced labor of Uyghurs, Kazakhs, Kyrgyz, or Members of other persecuted groups out of Xinjiang." UFLPA § 2(d)(2)(B)(ii).

## FACTUAL ALLEGATIONS

### I.    Plaintiff's Business

36.     Shenzhen Bitland is a privately-owned original equipment manufacturer ("OEM") that focuses on the development and manufacture of high-performance electronic products including graphic cards, laptops, tablets, and LCM modules. Following the closure of Hefei Bitland, Shenzhen Bitland now has two wholly-owned, currently-operating manufacturing centers in mainland China, which produce different products, tailored to their customers' technical specifications: a manufacturing center in Shenzhen that primarily produces components and accessories for computers, such as graphic cards, card readers, adapter cards, network cards, adapter boards, and mother boards; and a manufacturing center in Wuhan that primarily produces

notebook computers and desktop computers. Currently, Shenzhen Bitland and its subsidiaries have over 2,700 employees, none of whom are Uyghurs.

37.    Hefei Bitland was founded in 2010 as one of Plaintiff's manufacturing centers. During its existence, Hefei Bitland primarily manufactured or assembled computers/laptops, and computer components such as graphic cards or mainboards based on client needs. Hefei Bitland collaborated with clients in product design before manufacturing the products and did not sell direct to consumer or "off-the-rack." Prior to its inclusion on the BIS Entity List in July 2020, Hefei Bitland employed about 2,000 workers at its manufacturing site, 301 of whom were from the XUAR. None of Hefei Bitland's employees or dispatched workers from the XUAR continued to work at Shenzhen Bitland or any affiliated entity after the closure of Hefei Bitland due to its inclusion on the BIS Entity List.

38.    Prior to its inclusion on the BIS Entity List, CBP had never suggested that any of Hefei Bitland's or Shenzhen Bitland's products violated 19 U.S.C. § 1307.

**II.    Hefei Bitland is Listed on the BIS Entity List in July 2020 and Shuts Down**

39.    On July 22, 2020, BIS added Hefei Bitland to the BIS Entity List. *Addition of Certain Entities to the Entity List; Revision of Existing Entries on the Entity List,* 85 Fed. Reg. 44,159 (July 22, 2020). BIS provided no factual explanation for the listing at the time. When Hefei Bitland later submitted its first request for removal, BIS disclosed that its sole basis for the listing did not derive from any investigation or inspection of Hefei Bitland's business but rather was based on a single allegation in an appendix to a 2020 Australian Strategic Policy Institute ("ASPI") report. The ASPI report itself cited only one source for that allegation: a 2018 Xinjiang Daily article.

40.    In September 2020, DHS issued a WRO on Hefei Bitland. On information and belief, the WRO was issued as a result of and on the same basis as the listing by BIS.

41.    That chain of "evidence" supporting the BIS listing was facially inadequate. Neither the ASPI report nor the 2018 Xinjiang Daily article contained any evidence or finding that Hefei Bitland engaged in forced labor in 2018 or otherwise. The Xinjiang Daily article—which ASPI accepted for the truth of its underlying data—did not even mention Uyghurs. Instead, the article quoted workers describing improved income, voluntary participation, and better employment prospects.

42.    Rather than conduct its own verification, BIS appears to have adopted ASPI's unverified appendix entry, and Members of Congress then amplified the allegation in the ASPI report in urging BIS to add Hefei Bitland to the Entity List. But neither ASPI nor any Congressional member conducted any independent investigation, reviewed any employment records, or attempted to confirm conditions at Hefei Bitland. Nor did they grapple with the internal inconsistency of accepting the article's statistical data as reliable while ignoring its direct statements about voluntary participation and improved conditions.

43.    In other words, BIS's decision to add Hefei Bitland to the BIS Entity List in 2020, and, accordingly, DHS's WRO, rested on no substantiated evidence of forced labor.

44.    The results of the listing were predictable and catastrophic to Hefei Bitland's business. Hefei Bitland lost its major customer, Lenovo, within days and was forced to shut down production lines in July 2020, cease all manufacturing by August 2020, and lay off all employees by September 2020. The company never recovered and ultimately completed its formal deregistration on December 12, 2022.

### III.    UFLPA Takes Effect in 2022 and FLETF Lists a Non-Operational Company Without Explanation

45.    On June 17, 2022, DHS published its *Strategy to Prevent the Importation of Goods Mined, Produced, or Manufactured with Forced Labor in the People's Republic of China*: Report

to Congress, which included Hefei Bitland on the first UFLPA Entity List without identifying any factual basis for the listing. *Id.* at 23-25. On August 4, 2022, DHS published the first UFLPA Entity List in the Federal Register, which included Hefei Bitland, effective June 21, 2022. 87 Fed. Reg. 47,777 ("Listing Decision") at 47,779.

46.     DHS listed Hefei Bitland as having met the criteria for two sections of the UFLPA: Sections 2(d)(2)(B)(ii) and (v). Section 2(d)(2)(B)(ii) covers entities that are "working with the government of the Xinjiang Uyghur Autonomous Region to recruit, transport, transfer, harbor or receive forced labor or Uyghurs, Kazakhs, Kyrgyz, or members of other persecuted groups out of the Xinjiang Uyghur Autonomous Region." Section 2(d)(2)(B)(v) covers entities that "source material from the Xinjiang Uyghur Autonomous Region or from persons working with the government of the Xinjiang Uyghur Autonomous Region or the Xinjiang Production and Construction Corps for purposes of the 'poverty alleviation' program or the 'pairing-assistance' program or any other government labor scheme that uses forced labor."

47.     DHS did not provide any specific factual basis for listing Hefei Bitland under either section.

48.     The only support DHS included for its Listing Decision was a general statement that the UFLPA listings were based on two "sources:" (i) prior CBP actions (*e.g.*, Withhold Release Orders) and/or (ii) inclusion on the BIS Entity List. Listing Decision at 47,778.

49.     Hefei Bitland was placed on the BIS Entity List in July 2020 and, for the same reason, was subject to a WRO in September 2020. However, as described above, the factual basis for these actions was wholly unreasonable and rested on a single, unverified allegation that does not justify inclusion on the BIS list even if it were true.

50.     Had Defendants performed a reasonable investigation, they would have readily ascertained that the justification for inclusion on the BIS Entity List and the WRO was facially

unreasonable and, regardless, could not support listing on the UFLPA Entity List. Of course, Defendants would have also discovered that Hefei Bitland was *no longer operating* and, thus, could not meet the statutory criteria for listing even if the basis for the BIS listing and the WRO was accurate. Indeed, a non-operational company, by definition, cannot "work with" government authorities to recruit or transfer labor, nor can it "source material" under any XUAR-linked labor program. Listing a defunct entity is irreconcilable with the UFLPA's statutory criteria, each of which presupposes actual, ongoing activity. And the Court of International Trade has squarely held that the UFLPA does not apply retroactively to conduct occurring before the statute's effective date. *See Ninestar Corp. v. United States*, 687 F. Supp. 3d 1308, 1335-36 (Ct. Int'l Tr. 2024) ("*Ninestar II*").

51.     To date, Defendants have offered no explanation to reconcile their decision to list Hefei Bitland with the statutory requirements.

52.     The listing of Hefei Bitland on the UFLPA Entity List immediately inflicted direct commercial, operational, and reputational harm on Shenzhen Bitland. Indeed, Shenzhen Bitland's customers and business partners view doing business with Shenzhen Bitland as a regulatory and reputational risk even though Shenzhen Bitland was not on the UFLPA Entity List or otherwise accused of wrongdoing.

53.     Despite having before it a complete evidentiary record demonstrating that Hefei Bitland is defunct and cannot satisfy any UFLPA listing criterion, Defendants have continued to republish and update the UFLPA Entity List on an annual basis with Hefei Bitland included. Each such update constitutes an affirmative agency action that perpetuates the listing notwithstanding the elimination of its factual predicate and confirms that Defendants have failed to reassess whether there remains any "reasonable cause to believe" that Hefei Bitland meets the statutory criteria.

15

**IV.    Shenzhen Bitland Seeks and Obtains the Removal of Hefei Bitland from the BIS Entity List**

54.    On September 22, 2023, Shenzhen Bitland submitted a request, supported by substantial evidence, to the End-User Review Committee ("ERC") that Hefei Bitland be removed from the BIS Entity List. The evidence supporting the request proved not only that Hefei Bitland was non-operational and defunct but also contained overwhelming evidence that the original listing was groundless.

55.    In connection with the request for removal, Shenzhen Bitland collected and produced hundreds of pages of verifiable records covering 2020-2024. It also engaged FTI Consulting, a respected U.S.-based independent financial and investigative consultant that is well-known to the U.S. government, to conduct an independent investigation. FTI reviewed voluminous documents during the investigation, including audited financial statements, notice of deregistration and tax clearance records, liquidation records, employee rosters, payroll records, termination notice for employees and workers, and visited the prior location of Hefei Bitland in-person. That investigation confirmed, among other things:

a.    Hefei Bitland became non-operational in July 2020 shortly after the listing, following the loss of its major customer, Lenovo;

b.    None of the employees or labor dispatched workers from the XUAR have been transferred to Shenzhen Bitland's other entities;

c.    As of October 15, 2021, no Bitland entity employed any Uyghur or other workers from the XUAR;

d.    The inclusion of Hefei Bitland to the BIS Entity List since July 2020 has harmed Shenzhen Bitland's business; and

e.    After Hefei Bitland's inclusion on the BIS Entity List, Shenzhen Bitland has invested resources in enhancing the compliance policies and procedures relating to labor dispatch agency management and its recruitment process.

56.    On March 29, 2024, the Chair of the ERC and a senior member of her team met with Shenzhen Bitland's outside counsel and company representatives for a comprehensive presentation in support of removal. During that meeting, Shenzhen Bitland addressed every aspect of Hefei Bitland's history and shutdown: the company's complete wind-down in 2020, its lack of any operations thereafter, and the absence of any labor from the XUAR across all Bitland entities. It also walked the ERC through FTI's findings confirming Shenzhen Bitland's robust forced-labor compliance practices and policies.

57.    Presented with this record—which refuted the only allegation underlying the original listing and demonstrated conclusively that Hefei Bitland was defunct—BIS resolved this matter. On September 24, 2024, the ERC informed Hefei Bitland by letter that it had unanimously approved removal "based on an overwhelming amount of evidence" proving the company was dissolved and non-operational. Additionally, BIS explicitly acknowledged that "the parent company [Shenzhen Bitland] implemented a compliance program to enhance compliance and prevent any future actions that violate the Export Administration Regulations." On October 23, 2024, by Federal Register notice, BIS formally removed Hefei Bitland from the Entity List based on its "dissolution." *Addition of Entities, Revision of an Entry, and Removal of Entries on the Entity List*, 89 Fed. Reg. 84,460, 84,461 (Oct. 23, 2024); Press Release, BIS, *Commerce Adds 26 Entities to the Entity List for Actions Contrary to U.S. National Security Interests*, (Oct. 21, 2024).

58.    BIS's removal underscores the central point: the 2020 BIS listing rested on no credible evidence of forced labor at the time it was placed on the BIS Entity List and therefore

could not supply a lawful basis—even at the time—for DHS to list Hefei Bitland years later under the UFLPA.

## V.    Shenzhen Bitland Files Request for Removal with FLETF

59.    After succeeding in eliminating the only basis for Hefei Bitland's inclusion on the UFLPA Entity List, Shenzhen Bitland sought to have Hefei Bitland removed from the UFLPA Entity List—a process that should have been simple and straightforward given Hefei Bitland's defunct status and BIS's decision. On November 18, 2024, Shenzhen Bitland filed a formal removal request with FLETF, enclosing the BIS removal decision and hundreds of pages of independent, verifiable evidence confirming that Hefei Bitland was defunct, had ceased all operations years before the UFLPA took effect, and had never engaged in any conduct falling within UFLPA §§ 2(d)(2)(B)(ii) or (v). Shenzhen Bitland also affirmatively offered to answer any questions and to meet with agency staff.

60.    On December 10, 2024, Shenzhen Bitland followed up by email offering to provide additional materials. The next day, December 11, FLETF responded that it was "continuing to review" the Request and "expected to have questions in the coming weeks." But no questions arrived. When Shenzhen Bitland again asked on December 17 whether a meeting would assist the review, FLETF did not respond.

61.    On January 3, 2025, after weeks of silence, FLETF reversed course and stated that it in fact had "no questions for Hefei Bitland." Despite having no questions, FLETF offered a "listening session." Because a session with no questions, by definition, could not advance the removal decision—and given Shenzhen Bitland's urgent need for resolution—Shenzhen Bitland informed FLETF that it would decline the session to avoid further delay.

62.    On January 23, 2025, FLETF replied that it would "deliberate" and provide a decision "as expeditiously as possible." Shenzhen Bitland immediately sought clarification and

18

followed up again on February 7, 13, and 18, stressing the company's increasingly precarious financial position as delays dragged on. FLETF responded only once (on February 13), repeating that it was "continuing its internal deliberations," and then fell silent again, providing no timeline and identifying no factual dispute about the removal request.

63.    On March 10, 2025, Shenzhen Bitland again followed up—receiving no response. On May 1, Shenzhen Bitland requested a meeting; on May 9, FLETF answered only that it was still "deliberating," and then ignored Shenzhen Bitland's follow-up message on May 12. By this point, nearly six months had passed since Shenzhen Bitland's submission, which conclusively showed that the listing was baseless and against a non-operational, defunct company.

64.    On June 4, 2025, outside counsel wrote again, this time to the DHS Undersecretary, reiterating that Hefei Bitland had been removed from the BIS Entity List and had been defunct since 2020—thus indisputably undermining the basis for the UFLPA listing. FLETF never responded to that letter.

65.    On July 7, 2025, Shenzhen Bitland sent another email to FLETF, noting the recent holding by the Court of International Trade in *Ninestar II*, confirming that the UFLPA cannot be applied retroactively, explaining that Hefei Bitland ceased operations two years before UFLPA's effective date, and requesting removal expeditiously. FLETF acknowledged the email yet still took no further action.

## VI.    FLETF Finally Issues Questions Previously Answered and Others Unrelated to the Listing Decision

65.    Finally, on July 11, 2025—nearly eight months after Shenzhen Bitland's removal request—FLETF issued its first set of 14 questions, despite having repeatedly stated that it had "no questions" and gave Shenzhen Bitland two weeks to respond. The make-work questions focused on irrelevant information and could have been answered by simply reviewing the extensive

documentation Shenzhen Bitland sent with its removal request eight months earlier. The questions and responses focused on:

a.    **Corporate relationship and timeline:** FLETF asked Shenzhen Bitland to restate the corporate relationship between Shenzhen Bitland and Hefei Bitland and to reconfirm the precise dates of Hefei Bitland's shutdown, dissolution, and deregistration, even though Shenzhen Bitland had already provided such information, fully documenting that Hefei Bitland ceased operations in 2020, laid off all employees, and ultimately deregistered (Q2).

b.    **Compliance documentation:** FLETF requested Shenzhen Bitland identify and reattach 59 compliance documents that had already been included in Shenzhen Bitland's November 18, 2024, removal request. These documents reflected the company-wide labor-compliance program, pre-existing forced-labor policies, and audits demonstrating that there was no labor from the XUAR after Hefei Bitland's shutdown. FLETF also requested reports of several independent investigations conducted by FTI Consulting, JunZeJun Law Offices, and Zhong Lun Law Firm (all of which had previously been provided) confirming that, from 2020-2025, no Bitland entity employed workers from the XUAR; no workers are Uyghur or Kyrgyz; and none are hired through state-sponsored labor schemes or "poverty alleviation" programs. The FTI report also confirmed that former Hefei Bitland workers did not transfer to other Bitland entities (Q3-8).

c.    **Subsidiary roster:** FLETF asked for the names and addresses of all Shenzhen Bitland subsidiaries, despite the fact that Shenzhen Bitland had already provided this information in an organizational chart attached to the removal request.

Shenzhen Bitland nevertheless recopied and reproduced the requested information (Q9).

d.   **Management accountability:** FLETF asked whether Shenzhen Bitland had taken disciplinary actions against any employees who had held management roles at Hefei Bitland at the time of its 2020 BIS listing. Shenzhen Bitland explained that it had, in fact, taken such measures because BIS's erroneous 2020 listing created enterprise-wide risk, and Shenzhen Bitland reaffirmed the details already supplied in the removal package (Q10).

e.   **Labor dispatch agencies:** These questions sought lengthy explanations of Shenzhen Bitland's use of labor-dispatch agencies, even though the company had already submitted this information—and even though such dispatch practices are irrelevant to whether a defunct company (Hefei Bitland) participated in UFLPA-covered government labor schemes. Shenzhen Bitland again provided an explanation of dispatch-agency use for purely commercial reasons, including to manage demand and seasonal labor fluctuations, as well as the supervision and audits of these agencies to verify that compensation to workers was made in full and on time. It also provided confirmation that it received no government subsidies tied to the XUAR or minority hiring; as well as confirmation that all dispatch workers from the XUAR had become direct employees by July 2020—before the BIS listing—after which they lost their jobs due to the shutdown of operations caused by the listing (Q11, Q14).

f.   **Government contacts:** FLETF asked about possible contact with government representatives as many as five years earlier, but Shenzhen Bitland explained there was no record of such communications and no ongoing contact of any kind. Again,

21

this information was irrelevant to whether a dissolved entity meets UFLPA criteria (Q12).

g.    **No participation in state labor schemes:** Two of the fourteen questions asked Shenzhen Bitland to reconfirm—yet again—that neither Hefei Bitland nor any other Bitland entity had ever participated in the PRC's "poverty alleviation," "pairing assistance," "Xinjiang Aid," or related programs. Shenzhen Bitland reconfirmed what the documentary record already established, including through independent audits: no programs linked to forced labor existed anywhere in the Bitland group (Q12-13).

66.    Despite the compressed deadline imposed on the responses, it appears that FLETF did not even access the extensive documentation it requested (most of which had been previously submitted or could have been ascertained with reasonable diligence), until a month later when FLETF notified Plaintiff that it could not access the answers when it was preparing for the "listening session." FLETF even published an updated list without engaging with these materials. *Notice Regarding the Uyghur Forced Labor Prevention Act Entity List*, 89 Fed. Reg. 65,374 (Aug. 9, 2024).

67.    The "listening session" occurred on September 4, 2025. In contrast to the interactive meeting held with BIS in 2024, FLETF conducted a one-way virtual call and asked no questions whatsoever about the removal request or Shenzhen Bitland's extensive record, nor allowed Shenzhen Bitland to ask any of its own. It also did not permit any audio or visual recording, so it is unclear how a sufficient record of this part of the administrative process was memorialized to provide useful information. The agency never explained how the session would advance the process or what purpose it served.

68.    After the session, FLETF again told Shenzhen Bitland it would "reach out if it had questions." Shenzhen Bitland followed up on October 8 (during the U.S. government shutdown), and again on November 18 and December 8, but received no response. Only on December 22, 2025, a day after Shenzhen Bitland indicated that continued administrative engagement appeared futile and litigation would follow, did FLETF suddenly issue a second set of seven multi-part questions—none of which concerned Hefei Bitland's labor practices or defunct status, and many of which sought information far outside the scope of the removal request and FLETF's authority.

69.    Among the seven multi-part questions, none sought information about Hefei Bitland's labor practices and, again, none concerned the fact that Hefei Bitland was no longer operating. Instead, they sought expansive information about the business of the wider Bitland entities after Hefei Bitland was shut down. The questions sought information concerning:

a.    names/addresses of all dispatch agencies used by any Bitland entity (all of which were provided and had been reviewed and audited by two law firms to ensure compliance with international labor standards);

b.    names, addresses, ownership structure, and business scope of all Bitland entities (which were provided notwithstanding their irrelevance to Hefei Bitland's defunct status and confirmed lack of XUAR employees);

c.    products Hefei Bitland manufactured for each customer before its 2020 shutdown (provided) and how any outstanding contracts were fulfilled (no such contractual obligations continued after Hefei Bitland was shut down);

d.    whether any Bitland entity ever participated in a "poverty alleviation" program (never); and

e.  whether Lenovo has any ongoing business with other Bitland entities (provided), which is certainly irrelevant to any UFLPA criteria and beyond FLETF's scope of authority.

70.  Notwithstanding their irrelevance to the dispositive issue before the agency—whether there is any "reasonable cause to believe" that Hefei Bitland meets the statutory criteria for inclusion on the UFLPA Entity List—Shenzhen Bitland answered all questions by January 9, 2026.

71.  Following Shenzhen Bitland's January 9, 2026, submission responding fully to FLETF's second round of questions, the agency again failed to act. Instead, after weeks of silence, FLETF informed Plaintiff on February 27, 2026, that it intended to send additional follow-up questions once DHS's funding was restored and it resumed normal operations—despite already being in possession of an extensive evidentiary record demonstrating that Hefei Bitland is defunct and cannot meet any statutory basis for listing.

72.  More than two months later (and only after Plaintiff had provided FLETF with a draft complaint it intended to file to secure Hefei Bitland's removal from the UFLPA Entity List), on May 7, 2026, FLETF issued yet another set of questions—its third and purportedly "final"—requesting responses by May 21, 2026. The third questionnaire continued the same pattern that had characterized FLETF's prior information requests, again seeking information that had already been provided or that is irrelevant to the UFLPA's statutory criteria. In particular, the questions focused on:

a.  Shenzhen Bitland's use of interns across all entities, including recruitment channels, categories of interns (*e.g.*, vocational or university students), and the role of interns in production processes—despite the absence of any connection between

such programs and the UFLPA's focus on forced labor involving XUAR-linked populations.

b.  Extensive records regarding individual interns dating back to 2019, including names, educational affiliations, geographic origin, and ethnic background, as well as documentation from third-party labor dispatch agencies. These requests duplicated issues already addressed in prior due diligence reports and sought categories of information protected under applicable privacy laws.

c.  Detailed information regarding labor dispatch agencies—including documentation and assessments for specific agencies—despite having already received comprehensive independent due diligence reports confirming the absence of forced labor indicators and Shenzhen Bitland's robust compliance framework.

d.  Previously addressed topics relating to Bitland Group's organizational structure, historical operations, and customer relationships, including questions intended to reconcile alleged "discrepancies" in prior submissions that had already been explained in earlier responses.

73.  Shenzhen Bitland objected to the questions—noting that they were redundant, beyond the scope of what the UFLPA was intended to regulate, and/or not reasonably required for FLETF to complete its review under the authority granted by the UFLPA. Nevertheless, Shenzhen Bitland provided full responses to each question on May 21, 2026. In light of the agency's continued abdication of its responsibility to maintain the UFLPA Strategy and accompanying list— and its ongoing reliance on repetitive and irrelevant questioning—Shenzhen Bitland requested that FLETF issue a final removal determination by June 4, 2026, and advised that it would otherwise pursue judicial relief.

74. These most recent communications confirm that FLETF's delay is not attributable to any lack of information. Rather, despite having before it an extensive, unrebutted evidentiary record demonstrating that Hefei Bitland is defunct and cannot meet the statutory criteria for listing, FLETF has continued to prolong the process by issuing successive rounds of duplicative and immaterial questions instead of rendering a decision.

75. As of the filing of this action—over eighteen months after Shenzhen Bitland's removal request—FLETF still has not issued a decision, provided a timeline for a decision, identified a factual dispute, produced an administrative record, issued a "brief statement of reasons" for its constructive denial of the removal request, or most importantly, explained how a defunct company could meet any UFLPA criterion.

76. Based on publicly available information, including other UFLPA challenges, no listed entity has ever been provided with the administrative record absent litigation, underscoring the impracticability of obtaining relief through the administrative process.

77. Under these circumstances, any further administrative engagement would be futile. FLETF's prolonged inaction, its refusal to provide any explanation for continued listing, its apparent efforts to broaden the inquiry beyond Hefei Bitland to unrelated Bitland entities, and its failure to act even after BIS rescinded the only articulated basis for the UFLPA designation all demonstrate that the agency has effectively declined to decide the removal petition. Plaintiff's repeated efforts to move the process forward—including reminders of the worsening commercial and reputational harm to Plaintiff—were met with silence, confirmation that FLETF had no questions, or requests unrelated to the plainly unsupportable basis for Hefei Bitland's listing. FLETF's inaction and/or its continued listing of Hefei Bitland on the UFLPA Entity despite the clear negation of FLETF's stated basis has left Plaintiff with no meaningful avenue for administrative relief.

78.    Notwithstanding the futility of any further engagement with FLETF, the Court of International Trade has confirmed that exhaustion is not required in actions arising under the UFLPA. *Ninestar II*, 687 F. Supp. 3d at 1325-27. The CIT recognized four circumstances in which exhaustion is excused: (1) where the dispute presents a pure question of law, (2) where the agency withholds the administrative record, (3) where intervening judicial authority changes the controlling framework, or (4) where administrative pursuit would be futile. *Id.* at 1326 (citing *Gerber Food (Yunnan) Co. v. United States*, 601 F. Supp. 2d 1370, 1377 (Ct. Int'l Tr. 2009)). At least three of these circumstances are present here: (1) as a matter of law, the only basis for Hefei Bitland's inclusion was eliminated when BIS removed it from the BIS Entity List; (2) FLETF has not provided the administrative record; and (3) FLETF's year-long refusal to act, despite an undisputed factual record, demonstrates that further administrative efforts would be futile.

## VII.    Injuries to Plaintiff

79.    Defendants' one-and-a-half-year delay in acting on Plaintiff's request for removal has caused Plaintiff procedural harm as well as substantial commercial and reputational harm.

80.    The United States was once a significant market for Shenzhen Bitland and its affiliates. In 2019, Shenzhen Bitland and its affiliates reported approximately $500M in U.S. business and were well on track to reach that same amount in 2020. However, as a result of the erroneous inclusion on the BIS Entity List, its U.S. business came to a screeching halt.

81.    Since the BIS de-listing, Shenzhen Bitland has worked diligently to restore its commercial relationships—in particular, with U.S. market customers. But it has been consistently unable to do so.

82.    For example, one of the largest personal computer companies in the world who previously terminated its computer OEM contracts with Bitland Group in 2020, engaged Shenzhen Bitland to perform research and development work for a new computer product upon learning that

27

Hefei Bitland had been removed from the BIS Entity List. Despite expressing satisfaction with Plaintiff's performance on the research work, the customer declined to proceed with Plaintiff to conduct mass production, specifically citing internal regulatory requirements and concern that Plaintiff's products will be detained or excluded from the United States.

83. Similarly, a major Taiwan-based personal computer manufacturer who previously worked with other Bitland entities on other types of products, invited Shenzhen Bitland to Taiwan to discuss a new project following Hefei Bitland's removal from the BIS Entity List. Plaintiff submitted OEM proposals, but the customer ultimately declined to award the contract, citing the UFLPA Entity List designation as the decisive barrier. Because the customer ships products globally—including to the United States—it feared detention of goods manufactured by a Bitland entity.

84. Both customers have repeatedly inquired about the status of Plaintiff's removal request and have expressly stated that FLETF's failure to remove Hefei Bitland from the UFLPA Entity List is the sole barrier to awarding Plaintiff or its affiliates original equipment manufacturing contracts for products destined for the U.S. market.

85. These consequences are the logical and predictable result of the Defendants' inaction. Indeed, Plaintiff has repeatedly informed Defendants of this ongoing harm.

86. The failure to remove Hefei Bitland from the UFLPA Entity List has also stalled Plaintiff's efforts to restore its customer relationships globally. While once exporting cumulatively to 180 countries worldwide; today, Plaintiff and its affiliates now export to only two countries.

87. Given Shenzhen Bitland's strong R&D capabilities and manufacturing efficiencies, if the impact of Hefei Bitland's continuing presence on the UFLPA Entity List were eliminated through removal, Shenzhen Bitland has every reason to believe that its export business, including to the United

States, would restore to past levels, enabling it to resume supplying its customers who have been forced to use other suppliers.

88.    The reputational harm to Plaintiff extends beyond these prospective customers. Investors, business partners, and the public associate Plaintiff with forced labor and human trafficking. Plaintiff's commercial competitors have every incentive to repeat and amplify the unsupported and unexplained allegation in the Listing Decision directly and through trade groups, for their own commercial benefit.

## CLAIMS FOR RELIEF

**COUNT I: FLETF Violated the Administrative
Procedure Act, 5 U.S.C. § 706(1) Because FLETF Failed to Remove
or has Unreasonably Delayed Removing Hefei Bitland's Designation
(Against All Defendants)**

83.    Shenzhen Bitland realleges and incorporates by reference the allegations contained in all of the preceding paragraphs.

84.    5 U.S.C. § 706(1) creates a cause of action to "compel agency action unlawfully withheld or unreasonably delayed."

85.    Defendants are required to act on Plaintiff's removal request based on the plain text of the UFLPA, which requires Defendants to develop and annually update their UFLPA Strategy. *See* UFLPA § 2(e). This strategy includes keeping current the UFLPA Entity List with entities that meet its requirements. *Id.*

86.    Confirming this obligation, FLETF's standard operating procedures require the listing of entities where there is a *present* belief that the entity meets the UFLPA's listing requirements. Further confirming this obligation, the Federal Register notice that announced the Listing Decision sets forth a removal request procedure whereby removal requests are approved by a majority vote of FLETF members. 87 Fed. Reg. 47,778.

29

87.    Defendants have failed to carry out each of these discrete duties or, in the alternative, have unreasonably delayed in carrying each out.

88.    Defendants have been in possession of information conclusively showing that Hefei Bitland is defunct and cannot meet the statutory basis for listing under the UFLPA since at least November 2024 when Shenzhen Bitland submitted a removal request. Yet, Defendants have failed to remove Hefei Bitland from the UFLPA Entity List despite having a statutory duty to do so.

89.    Alternatively, Defendants have unreasonably delayed removing Hefei Bitland from the UFLPA Entity List in light of, *inter alia*: (1) Defendants' statutory obligation to update their UFLPA strategy on an annual basis; and (2) the profound and existential harm a listing can have on a company and its business partners.

90.    Additionally, under Section 555(b) of the APA, agencies must conclude matters presented to them in a reasonable time, yet Defendants have taken no action for over eighteen months despite receiving indisputable evidence that Hefei Bitland does not meet the statutory criteria for listing under the UFLPA. 5 U.S.C. § 555(b). Defendants have also failed to provide Shenzhen Bitland with any notice, explanation, or statement of reasons in response to its removal request in violation of Section 555(e) of the APA. *Id.* § 555(e).

91.    Defendants' unlawful acts are causing and will continue to cause irreparable harm to Shenzhen Bitland and third parties. Shenzhen Bitland has no adequate alternative to review under the APA.

92.    Because Hefei Bitland is indisputably not operating, as recognized by BIS, and, thus, does not meet the statutory requirements for listing, there is no compelling reason to remand. The Court can and should vacate the listing or, in the alternative, remand with instructions to vacate the listing.

30

**COUNT II: The Continued Listing of Hefei Bitland
Violates the Administrative Procedure Act, 5 U.S.C. § 706(2)
(Against All Defendants)**

93.      Plaintiff incorporates by reference all allegations contained in the preceding paragraphs as if set forth fully herein.

94.      Each of the Defendants is subject to the requirements of the APA.

95.      The APA requires the reviewing court to set aside agency action that is "arbitrary and capricious, an abuse of discretion, or otherwise "not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of a statutory right," 5 U.S.C. § 706(2)(C), and without observance of procedure required by law, 5 U.S.C. § 706(2)(D).

96.      "In the administrative law context, it is black letter law that 'inaction may represent effectively final agency action that the agency has not frankly acknowledged.'" *Vara v. DeVos*, 2020 WL 3489679, at *29 (D. Mass. June 25, 2020) (quoting *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987). "'[W]hen administrative inaction has precisely the same impact on the rights of the parties as denial of relief, an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief.'" *Sierra Club*, 828 F.2d at 793 (quoting *Environmental Defense Fund, Inc. v. Hardin*, 428 F.2d 1093, 1099 (D.C. Cir. 1970)).

97.      Defendants' failure to abide by their statutory duties to update their UFLPA Strategy constitutes reviewable agency action under 5 U.S.C. § 706(2).

98.      Plaintiff submitted a detailed Request for Removal to FLETF with the BIS rescission and voluminous corroborating evidence demonstrating that Hefei Bitland is defunct and cannot meet any statutory basis for listing. Defendants have not updated the UFLPA Entity List despite their obligations set forth in the UFLPA. *See, e.g.,* UFLPA § 2(e).

99.      Defendants' prolonged inaction has precisely the same practical and legal effect as a denial of Plaintiff's removal request. For more than a year, FLETF has possessed a complete and

31

unrebutted record demonstrating that Hefei Bitland is defunct and cannot satisfy any UFLPA listing criteria, yet it has failed to issue a decision, articulate any basis for continued listing, or identify any outstanding factual issue. Instead, FLETF has prolonged the process through successive rounds of duplicative and immaterial questioning, while Plaintiff continues to suffer the ongoing consequences of the listing. Under these circumstances, Defendants' inaction constitutes final agency action that may be reviewed under the APA, and Defendants cannot evade judicial review by withholding a formal decision.

100.    As explained in detail above, Defendants' continued listing of Hefei Bitland is arbitrary and capricious and not in accordance with law because: (a) Defendants failed to update the UFLPA Entity List with the latest, current information concerning the negation of FLETF's basis for listing Hefei Bitland, thereby effectively denying Plaintiff's removal request without issuing a decision; (b) Defendants have failed to update the UFLPA Entity List despite being in possession of information that conclusively demonstrates that the listing cannot be sustained; and (c) Defendants failed to complete the removal request procedure that DHS set forth in the Listing Decision. Listing Decision at 47,778.

101.    The Supreme Court has squarely held that "statutory grant[s] of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). The Court of International Trade has confirmed that the UFLPA does not apply retroactively to conduct occurring before the statute's effective date. *See Ninestar II*, 687 F. Supp. 3d at 1335-36. Defendants' continued listing of Hefei Bitland necessarily depends on an impermissible retroactive application of the UFLPA, in direct contravention of the statute's requirement that FLETF continuously update the UFLPA Strategy.

102. Defendants' unlawful acts are causing and will continue to cause irreparable harm to Shenzhen Bitland and third parties. Shenzhen Bitland has no adequate alternative to review under the APA.

103. Because Hefei Bitland is indisputably not operating, as recognized by BIS, and, thus, does not meet the statutory requirements for listing, there is no compelling reason to remand. The Court can and should vacate the listing or, in the alternative, remand with instructions to vacate the listing.

## REQUESTED RELIEF

WHEREFORE, Plaintiff prays that this Court grant the following relief:

1. Declare that Defendants' failure to remove Hefei Bitland from the UFLPA Entity List is action unlawfully withheld and unreasonably delayed under 5 U.S.C. § 706(1) and is unlawful agency action under 5 U.S.C. § 706(2);

2. Issue an order vacating and setting aside the determination to add Hefei Bitland to the UFLPA Entity List and permanently enjoining Defendants from implementing or enforcing that designation or, in the alternative, remand this matter to FLETF with instructions to remove Hefei Bitland from the UFLPA Entity List;

3. Award Shenzhen Bitland its costs and reasonable attorney fees; and

4. Grant any further relief that this Court may deem just and proper.

DATED: June 12, 2026

/s/ Wendy Wysong
Wendy Wysong
Brian J. Fleming
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
Tel: (202) 429-8158
wwysong@steptoe.com
bfleming@steptoe.com

Michael G. Scavelli
STEPTOE LLP
1114 Avenue of the Americas
New York, NY 10036
Tel: (212) 506-3900
mscavelli@steptoe.com